IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| v. | § § | |
| JUAN AGUILAR, | § § § § § § § | No. SA-14-CR-223-XR |
| *Defendant.* | | |

**ORDER**

On this day the Court considered Defendant Juan Aguilar's motion for a new trial. Docket no. 86. Defendant asks the Court to vacate the jury's guilty verdict pursuant to Federal Rule of Criminal Procedure 33. Aguilar's motion was timely filed after the Court granted him two extensions of time. FED. R. CRIM. P. 33(b)(2). For the following reasons, the Court DENIES the motion.

**I.   Background**

Defendant Juan Aguilar was arrested for sexual abuse of a ward in violation of 18 U.S.C. § 2243(b) on February 26, 2014. The arrest stemmed from an incident on February 17, 2014 at the South Texas Detention Complex ("STDC" or "GEO"), where Aguilar was accused of knowingly engaging in a sexual act with a detainee over whom he had "custodial, supervisory, or disciplinary authority." Docket no. 3. STDC is a facility where detainees are held before trial by the Department of Homeland Security. Aguilar was an employee at STDC as a "kitchen clerk" at the time of the incident. He was accused of, and later admitted to, performing oral sex on a

detainee, Jesus Andino Lanza, in a freezer in STDC's kitchen. The Court held a three day trial and a jury found Aguilar guilty of the charged crime. Docket nos. 65-73.

The one-count indictment was issued on March 19, 2014. Docket no. 19. That same day, the Government informed defense counsel that a possible material witness (Cristian Mauricio Calderon Flores), who the government had previously interviewed, was scheduled for deportation on March 27, 2104. The Government did not believe Calderon Flores was a material witness, but nevertheless notified defense counsel anyway. After email discussions, defense counsel sent her investigator, Juan Hernandez, to interview Calderon Flores at STDC. Following that interview, defense counsel declined to detain Calderon Flores as a material witness. *See* docket nos. 87-8 and 86, at 7. Defense counsel and her investigator kept in contact with Calderon Flores after his deportation.

At the Defendant's request, the case was continued twice, delaying trial. Docket nos. 28 and 31. At a docket call on September 4, 2014, Aguilar indicated he was ready for the trial set for September 15, 2014. On September 5, 2014, Aguilar requested the Court issue a subpoena for Calderon Flores.[1] Docket no. 44 (sealed and *ex parte*). On September 9, Magistrate Judge Primomo denied the subpoena because Calderon Flores is a foreign national residing outside the United States, and thus outside the Court's subpoena power. Docket no. 49 (sealed and *ex parte*). Due to a mistake in chambers, the Magistrate Judge then granted the request to issue a subpoena on September 10. Docket no. 50 (sealed). On September 11, 2014, the Magistrate Judge clarified his orders and rescinded docket no. 50.

The parties appeared in open court on September 11, 2014 to make arguments on the pending motions in limine. On Friday, September 12, Aguilar, then filed a motion to compel

---

[1] Referred to in the request as "Christian Mauricio Calderon."

discovery, and verbally made a motion for continuance (arguing that the Government provided certain discovery late).  The Court held a hearing that same evening where Aguilar argued for a continuance due to the denial of the Calderon Flores subpoena.  The Government argued Calderon Flores was not a material witness, and his information, especially with regard to the custodial, supervisory, or custodial control element was not unique.  The Court issued an oral order affirming the denial of the subpoena and denying a continuance because: 1) the Court lacked subpoena authority over Calderon Flores; 2) defense counsel had ample opportunity but declined to detain Calderon Flores as a material witness; 3) without an affidavit, the Court was unsure of the materiality of Calderon Flores's potential testimony; and 4) delaying the trial would prejudice the Government.  The Court instructed the parties to work together to perhaps get Calderon Flores admitted into the country to testify or secure and admit an affidavit from him.

The morning of jury selection (September 15, 2014), Aguilar renewed his objection and motion for continuance due to Calderon Flores's absence.  Aguilar advised the Court that he was unable to secure an affidavit from Calderon Flores or his admittance into the country.  The Court again denied the continuance and proceeded with trial, where Aguilar was ultimately found guilty of violating § 2243(b).  Docket no. 73.  Aguilar filed his motion for new trial on October 29, 2014.  Docket no. 86.  The Government filed its response to the motion on November 11, 2014.  Docket no. 87.

## II.     Analysis

Aguilar moved the Court to grant a new trial under the Fifth and Sixth Amendments and Rule 33, arguing his due process rights were violated when the Court did not postpone trial to

allow more time for Aguilar to secure Calderon Flores's appearance and testimony for trial. Aguilar argues Calderon Flores was a necessary witness for trial and the Government's actions regarding Calderon Flores violate the Sixth Amendment's Compulsory Process Clause.

He further argues that: (1) he had no independent authority to bring Calderon Flores to the United States; (2) Calderon Flores was a material and necessary witness; (3) the Government improperly impeded him from securing Calderon Flores by not fully cooperating with his request to parole Calderon Flores into the United States[2]; (4) the Court erred in not subpoenaing Calderon Flores; (5) defense counsel did not waive Aguilar's right to Calderon Flores's testimony when she failed to secure Calderon Flores as a material witness despite knowing his deportation was imminent; and (6) Aguilar should not be found to have waived his right to a necessary witness under these circumstances because such a ruling would violate public policy.

A motion for new trial under Rule 33 permits the Court to grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). In the Fifth Circuit, a new trial "should not be granted 'unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.'" *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004)).

### A. Compulsory Process

The Sixth Amendment provides a criminal defendant the right to offer the testimony of favorable witnesses and "to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI; *Washington v. Texas*, 388 U.S. 14, 19 (1967). A defendant has the right to the government's assistance in compelling favorable witnesses to testify. *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) ("Our cases establish, at a minimum, that criminal defendants

---

[2] Relying upon *United States v. Theresius Filippi*, 918 F.2d 244 (1st Cir. 1990).

have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.").[3]

However, the Compulsory Process right is not absolute. *United States v. Campbell,* 874 F.2d 838, 851 (1st Cir. 1989). A defendant's Compulsory Process rights are violated only when (1) the Government's acts or omissions prevented a witness' testimony, and (2) the testimony prevented would have been material and favorable. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982); *United States v. Perez*, 217 F.3d 323, 326 (5th Cir. 2000); *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990).

### i.  Action attributable to the Government and waiver

For Aguilar's Compulsory Process right to be violated the Government's actions or omissions must have caused the witness to not testify. *See United States v. Weddell*, 804 F.2d 1343 (5th Cir. 1986). Aguilar argues that the Government impermissibly interfered with Calderon Flores testifying at trial because: (1) the Court did not subpoena Calderon Flores, which would have given Aguilar the ability to parole Calderon Flores into the United States;[4] and (2) the Government refused to provide "meaningful assistance" to Aguilar and "put up impediments" into paroling Calderon Flores into the United States.

First, the Court was correct and did not violate Aguilar's Compulsory Process right when it denied issuing a subpoena for Calderon Flores. The Compulsory Process right does not apply to alien witnesses residing outside the United States. *See United States v. Zabaneh*, 837 F.2d

---

[3] Courts analyze cases with similar issues through the Due Process clause. Regardless of the clause of the Constitution, the analyses are essentially identical. *Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 445, n.4 (3d Cir. 1992).

[4] This argument is only referenced in Aguilar's brief, but was urged strongly by defense counsel at the first hearing on the Compulsory Process issue on September 12, 2014.

1249, 1259-60 (5th Cir. 1988). Courts cannot issue subpoenas to non-citizens residing outside the United States. *See* 28 U.S.C. § 1783; *Relational, LLC v. Hodges*, 627 F.3d 668, 673 (7th Cir. 2010) (citing *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993)). Therefore, the Sixth Amendment right to Compulsory Process is not violated when a district court does not issue a subpoena to an alien witness residing outside the United States. *See* 28 U.S.C.A. § 1783; *United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962) ("[T]he Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it. Otherwise any defendant could forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as a witness in his favor.").

Here, the Court found it did not have subpoena power over Calderon Flores because he was a foreign national residing outside the United States. *See* docket no. 49; *see also* docket no. 64. Therefore, the Court's refusal to issue a subpoena to compel Calderon Flores's appearance was not an action attributable to the Government that denied Aguilar's Compulsory Process right because the Court could not properly issue the subpoena. *Contrast with Bennett v. Scroggy*, 793 F.2d 772, 776–77 (6th Cir. 1986) (holding without explanation that Compulsory Process right was violated when the district court refused to grant an overnight continuance to allow defendant to secure a subpoenaed witness).[5]

Second, the Government did not impermissibly impede or fail to cooperate with Aguilar to parole Calderon Flores into the United States. "Because of its duty to execute the immigration policy adopted by Congress, the government may deport undocumented alien witnesses upon a good-faith determination that they possess no information favorable to a criminal defendant."

---

[5] Even if the Court had the power to subpoena Calderon Flores it is not clear that this action alone would have violated the Compulsory Process Clause given the discussion of waiver below.

*Perez*, 217 F.3d at 326. Circuit courts addressing the issue have found a defendant needs to show the Government acted in "bad faith" resulting in the witness' absence at trial. *See, e.g.*, *United States v. Chaparro-Alcantara*, 226 F.3d 616, 623-24 (7th Cir. 2000), *cert. denied*, 531 U.S. 1026 (2000); *United States v. Dring*, 930 F.2d 687, 693-94 (9th Cir. 1991), *cert. denied*, 506 U.S. 836 (1992).[6]

Regardless of any intent requirement, all the cases addressing the Compulsory Process issue demonstrate that it must be the Government's actions that result in the unavailability of the witness in order for the Compulsory Process clause to be violated. *See, e.g.*, *Perez*, 217 F.3d at 326 ("[T]he deportation of the alien witnesses before they could be interviewed by the defense deprived him of his sixth amendment right to compulsory process."); *Weddell*, 800 F.2d at 1410 (consistently citing "government conduct" as necessary for a Compulsory Process claim).

The Government is permitted to deport potential witnesses in criminal cases if it determines the witness is immaterial. *Perez*, 217 F.3d at 326. If a defendant wishes to label a potential witness as material who is marked for deportation, she may file a material witness complaint, which compels the Government to detain the witness until a deposition is taken. *See* 18 U.S.C. §§ 3142 and 3149; Western District of Texas Local Rule CR-15B(b)(2)(B) (providing for the detention of material witnesses for 45 days to secure a deposition). If the witness is subsequently deported before trial, the deposition is admissible because the witness is unavailable. FED. R. CRIM P. 15(e); FED. R. EVID. 804.

The Government may also parole voluntary alien witnesses into the United States after the witness was deported if paroling would bring a "significant public benefit." *See* 8 C.F.R

---

[6] But it is unclear if the Fifth Circuit agrees, or requires any showing about the Government's intent. *United States v. Sierra-Hernandez*, 192 F.3d 501 (5th Cir. 1999), *cert. denied*, 528 U.S. 1178 (2000) (noting the Ninth Circuit requires bad faith, but only applying the materiality and favorability aspects of the test).

§ 12.5(a)(4).  The Government was not aware of Aguilar's request for Calderon Flores's trial presence until Friday, September 12, 2014.  The trial began the morning of Monday, September 15, 2014.  The parties communicated over the weekend about Calderon Flores's parole. The documents submitted into the record by the Government demonstrate:  (1) it refused to agree to the admission of a yet-to-be-taken affidavit from Calderon Flores on September 13, 2014; (2) the prosecutor told defense counsel that she should contact United States Customs and Border Protection to discuss Calderon Flores's possible parole; and (3) the prosecutor would speak to immigration officials if contacted about possible parole for Calderon Flores.  *See* docket no. 87-4 and 5.

The day Aguilar was indicted, the Government informed defense counsel that it had interviewed Calderon Flores and determined he was not a material witness, but made Calderon Flores available for defense counsel to interview to make her own determination.  Defense counsel's investigator interviewed Calderon Flores before his deportation and then defense counsel made the conscious decision to not list Calderon Flores as a material witness with the knowledge that Calderon Flores would be released from the Government's custody and deported. Docket nos. 87-8 and 86, at 7.  Defense counsel now states she did not wish to keep Calderon Flores detained for an extended period simply to take his deposition after the Government refused to release him on bond.  *See* docket no. 86.

The Government argues Aguilar waived his Compulsory Process right with respect to Calderon Flores.  The Government argues defense counsel's decision to not file a material witness complaint to keep Calderon Flores detained temporarily to secure his deposition caused Calderon Flores's absence at trial and the Government's actions did not cause his absence.

The Court finds defense counsel's decision not to hold Calderon Flores as a material witness waived Aguilar's Compulsory Process right because the right is only implicated where the Government deports the witness before defense counsel had an opportunity to interview the witness. *See Valenzuela-Bernal,* 458 U.S. 858, 873 (discussing a situation where the government deported the potential witness before the defendant had an opportunity to interview the witness); *See Perez*, 217 F.3d at 326 (same); *United States v. Avila-Dominguez*, 610 F.2d 1266, 1269 (5th Cir. 1980) ("[A] criminal defendant's constitutional rights are violated if an alien witness is deported before the defendant is given an opportunity to interview the witness.") Aguilar had the opportunity to interview Flores, and did interview him, prior to his removal. Aguilar had the opportunity to depose Calderon Flores, but failed to take advantage of that opportunity. If he had taken the deposition it would have been admissible at trial. FED. R. CRIM P. 15(e); FED. R. EVID. 804.

Aguilar argues *Filippi* requires the government to cooperate more with a defendant than the Government did here. In *Filippi*, a foreign witness would have voluntarily appeared at trial but the Government actively ignored several requests from the defense and the judge to parole the witness into the United States, and the district court specifically found the witness was material and favorable. 918 F.2d at 247.

Here, however, the Government has not impermissibly interfered with securing Calderon Flores's testimony because the act that prevented the testimony was attributable to the defendant, not the Government. The Government specifically tendered Calderon Flores to the defense, and offered to keep him in custody as a material witness. Aguilar specifically declined that right with the knowledge Calderon Flores would be deported. Aguilar only requested Calderon

9

Flores's presence days before trial, and the Government was within its right to oppose the motions for continuance. The Government had already secured its witnesses for trial and there was no certainty that Calderon Flores would actually testify and be given parole to enter into the United States. Aguilar caused Flores's absence, unlike in *Filippi*.[7]

Aguilar argues he did not effectively waive the Compulsory Process right because he did not waive this constitutional right knowingly and intelligently. Alternatively, Aguilar argues the Court should not adopt a "waiver theory" because it places defendants and their attorneys in the position of over-aggressively and unnecessarily keeping potential material witnesses in jail to protect defendants' Compulsory Process rights. As a preliminary matter, defense counsel's position that persons facing deportation would be subjected to extended incarceration is factually incorrect. The Western District of Texas Local Rule places strict time limits on when depositions of individuals must take place.

Next, Aguilar may not have had to waive the right knowingly and intelligently to properly waive it. Aguilar cites the Ninth Circuit and a footnote from a district court in Maryland for this rule. *United States v. Medina-Villa*, 567 F.3d 507, 517 (9th Cir. 2009); *United States v. Tariq*, 521 F. Supp. 773, 779 n.9 (D. Md. 1981). The Fifth Circuit has never adopted this line of cases. Moreover, *Medina-Villa* does not support Aguilar's position, as the *Medina-Villa* court held that a defendant needs to make a "knowing and intelligent" waiver only for witnesses the Government or the defendant designate as material. 567 F.3d at 517 (finding that if the Government does not believe the witness is material "it does not need to seek a [knowing and intelligent] waiver, and it may deport the witnesses before granting the defendant the

---

[7] At trial, Aguilar contended that *U.S. v. Tirado-Tirado*, 563 F.3d 117 (5th Cir. 2009) required the Government to make more of an effort to help him parole Flores into the United States. However, *Tirado-Tirado* is a Confrontations Clause case, which requires the Government make "good-faith" efforts, that has no bearing on this Compulsory Process analysis.

opportunity to interview them;" discussing the Supreme Court's decision in *Valenzuela-Burnel*'s impact on the Ninth Circuit's previous decision in *United States v. Lujan–Castro*, 602 F.2d 877, 878 (9th Cir. 1979) (per curiam) that required knowing and intelligent waiver for all witnesses). The *Tariq* court's discussion is similarly unpersuasive because it bases its "knowing and voluntary" rule on the same *Lujan-Castro* holding from which the Ninth Circuit retreated from in *Medina-Villa*.[8]

Even given the Ninth Circuit's old rule that a defendant had to knowingly waive the Compulsory Process right for immaterial witnesses, the Court finds Aguilar knowingly and intelligently waived the Compulsory Process right as it related to Flores when he interviewed Flores and declined to obtain his testimony pursuant to § 3149.

Defense counsel had ample time to interview Calderon Flores before his deportation, and could have extended that time if she desired by designating him as a material witness to take a deposition that would have been admissible at trial. She did not. Aguilar also had more than five full months to develop Calderon Flores's testimony and contact the Government to secure his attendance at trial or some other form of testimony like an affidavit. Instead Aguilar waited until days before trial.

Aguilar waived his right to Compulsory Process with regard to Calderon Flores when he did not designate Calderon Flores as a material witness to detain and depose him before Calderon Flores was deported. The Government did not act to prevent Calderon Flores's testimony.

   ii.  **Material and Favorable**

---

[8]*Tariq* is also distinguishable because the defense counsel there was not afforded the opportunity to interview the potential witnesses personally. 521 F. Supp. at 779 n.9. Here, defense counsel was assigned to the case, she had her investigator interview Calderon Flores, and knowingly declined to have him detained for a deposition.

Aguilar contends that Calderon Flores's testimony was material and favorable and attached to the motion for new trial an affidavit from Calderon Flores (secured after the trial concluded) to demonstrate his potential testimony. *See* docket no. 86-1. The Compulsory Process right is violated only when the absent witness' testimony is material and favorable. *Perez*, 217 F.3d 323, 326 (citing *Valenzuela–Bernal,* 458 U.S. at 874). Material means "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Valenzuela–Bernal*, 458 U.S. at 874 (citing *United States v. Bagley*, 473 U.S. 667, 681-682 (1985)). The *Bagley* court specified "reasonable probability is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682 (internal quotation marks omitted). The testimony must also be more than cumulative to what is already available. *Perez*, 217 F.3d 323, 326 (citing *Valenzuela–Bernal,* 458 U.S. at 874 (holding that the testimony of the absent witness must be illuminating "in ways not merely cumulative to the testimony of available witnesses"). Calderon Flores's potential testimony was merely cumulative of the several available witnesses and was immaterial because there is not a reasonable likelihood that the testimony would have affected the jury's judgment.

At trial, the Court instructed the jury that the elements they must find beyond a reasonable doubt for a violation of 18 U.S.C. § 2243(b) include:

1)  That the Defendant knowingly engaged in a sexual act with the victim.

2)  That, at the time, the victim was in official detention at the STDC; and

3)  That, at the time, the victim was under the custodial, supervisory, or disciplinary authority of the Defendant.

As a preliminary matter, the Court finds that Calderon Flores's testimony, be it his affidavit or live testimony, could not have reasonably affected the jury's decision with regard the first two elements. There was overwhelming evidence, including Aguilar's signed confession and his own testimony at trial, that he knowingly engaged in a sexual act. It was also undisputed that the act occurred in STDC while the victim was detained there.

The only element of the offense Calderon Flores's testimony arguably could have impacted was whether the victim was under the "custodial, supervisory, or custodial authority" of the Defendant. For this element, the jury heard extensive testimony at trial from STDC employees, including staff in the kitchen where the offense occurred, the victim, investigating officers, and Aguilar. The jury also was presented with extensive documentation, including Aguilar's job description and training materials. The relevant evidence is set out below.

Jay Ghazi testified that he is a kitchen supervisor at STDC. *See id*. at 209:7–10. He stated that he has worked at the detention center since May 2008 and has held the same position since then. *See id*. at 209:15, 223:2–13 (clarifying that the name of his position has changed but his duties have remained the same). As kitchen supervisor, Ghazi said that he has authority over the detainees. *Id*. at 211:23–24. He explained that his duties include training the detainees to work in the kitchen and the detainees are also trained by other kitchen staff members. *Id*. at 211:6–15. Ghazi added that when training the detainees to work in the kitchen, they are instructed to follow the instructions of all kitchen staff personnel, including the kitchen clerk. *Id*. at 213:14–24.

Lanza explained that he was a STDC detainee at the time the incident occurred. *See id*. at 255:13–19, 256:18–21. While he was a detainee, he was a voluntary worker in the kitchen;

when the incident occurred, he was working his shift in the kitchen. *Id*. at 255:18–19, 256:14–24. He further testified that as part of the detention facility rules, detainees are told to follow instructions of staff members. *See id*. at 271:18–25, 272:1. Lanza testified that the kitchen supervisors instruct the detainees on "what jobs need to be done." *See id*. at 274:14–16, 25; 275:1–4. Lanza stated that kitchen staff members wear black uniforms and kitchen detainees wear white uniforms. *See id*. at 271:6–10; 274:14–22. He identified the defendant in video evidence and stated that the defendant was wearing black. *See id*. at 271:4. Lanza explained that Aguilar told him to follow him into the freezer and Aguilar gave Lanza an orange jacket to wear in the freezer. *Id*. at 257:16–18; see *id*. at 257:19–23 (testifying that he was moving empty boxes in the kitchen when he was told by the defendant to follow him into the freezer); *see also id*. at 258:1–5 (explaining that the orange jackets are used when working in the freezer). He also testified that he followed Aguilar's instructions to go in the freezer and once inside the freezer to move certain boxes. *See id*. at 258:6–7, 19–25; 259:1; *see also id*. at 258:16–24 (describing the defendant's instructions to move boxes from behind the freezer door to the back of the freezer).

Manuel Rodriguez is a detention officer at the STDC and was assigned to Lanza's dorm the day of the incident. *See id*. at 321:6–322:7. Rodriguez testified that prison staff members and detainees each wear specific colored uniforms in the kitchen. *See id*. at 327:15–25. Rodriguez further testified that "[t]he detainees are always supposed to do orders of kitchen staff member[s], black uniform or khaki uniform, officer." *Id*. at 328:11–12.

Robert Balli is the training administrator at the STDC. *See id*. at 336:6–7, 15. Balli testified that prison staff members receive an initial 120-hour classroom training and then a 40-hour "refresher" training each subsequent year. *See id*. at 337:2–3; 342:14–22. He further

explained that the training for kitchen personnel is the same as the training for other kitchen staff members because these positions "are considered contact positions, where they have direct contact with detainees." *Id*. at 337:4–9; see *also id*. at 344:4–8, 20–25, 345:1 (clarifying that even those in contact positions where the contact is infrequent still receive this training). Balli testified that, among other things, the training consists of proper employee and inmate relationships and that Aguilar received all of his required training. *See id*. at 342:23–25, 343:1–7. Additionally, Balli testified that Aguilar received a copy of the detainee handbook that specifies that detainees "are to follow all orders given by all staff." *Id*. at 339:19–25, 340. He also testified that Aguilar received the Standards of Employee Conduct, which discusses the appropriate contact between detainee and prison staff members and specifically states that "improper sexual activity with a person in custody is against the law." *Id*. at 341; *see also id*. at 342:1–2 (stating that the defendant signed the Standards of Employee Conduct which acknowledges that the defendant read it and understood it). On cross-examination, he stated that every employee at the facility has authority over a detainee. *See id*. at 346:17–24 ("I am talking about every order that is given to a detainee, whether it be a clerk, anybody, any official employee at the facility has the authority to give orders to any of the detainees."). On redirect examination, Balli further clarified the types of positions that receive the extensive training:

> The biggest difference would be the degree of access you have to the detainees. Sometimes it is referred to as "the hard side." It is separated by riot gates, control mechanisms in place. And typically, the administrative staff, that works in what we call the front or "the soft line," do not have contact with detainees. If they do, it would be very minimal, perhaps going to eat in a dining room or something. Other than that, they wouldn't have routine contact with detainee population.

*Id*. at 349:19–350:2.  Lastly, Balli testified that the defendant's position in the kitchen would be described as behind the hard side.  *See id*. at 350:3–6.

Jose Salazar is employed by Immigration and Customs Enforcement ("ICE") as a deportation officer.  *See id*. at 351:3–16.  In this position, he is the contracting representative at STDC.  *Id*. at 351:17–18; s*ee also id*. at 351:20–23 (explaining his role is to "oversee the contract that the Department of Homeland Security has over GEO . . . .").  Salazar testified that as part of kitchen policy, all kitchen personnel, including the kitchen clerk, have authority over the detainees, and all detainees are told to follow the instructions of all prison staff members.  *Id*. at 360:4–14; *see also id*. at 361:11–13 (reading the kitchen policy that states "[c]ustody and security within the department is the responsibility of food service personnel, even when security personnel are present."); *but see id*. at 361:21–362:16 (conceding that food service clerk is not even listed in the kitchen policy, but other positions are specifically referred to).  Salazar testified that detainees are not aware of what the prison staff member's job description states.  *Id*. at 374:9–11.  Lastly, Salazar testified that detainees need to get permission from a kitchen staff member to leave the kitchen, use the restroom located in the kitchen, and take a break to eat.  *See id*. at 374:21–375:2, 379:20–25, 380:1–9; *see also id*. at 378:17 ("All detainees are escorted for voluntary work programs . . . .").

Special Agent Hector Lira is a Special Agent of the Department of Homeland Security, located in Laredo, Texas.  *Id*. at 381:1–3.  Agent Lira obtained a sworn statement from Aguilar about the incident which, in part, stated:  "I asked Ghazi for a detainee and chose the nearest one randomly.  I gave the detainee a jacket and told him to follow me.  When we got to the freezer, we began restacking the boxes."  *Id*. at 386:1–4; *see id*. at 385:9–386:22 (reading into evidence

the defendant's sworn statement); 387:8–16 (emphasizing that the defendant asked for a detainee, chose the nearest one randomly, gave the detainee a jacket, and instructed the detainee to follow him into the freezer); *see also id*. at 382:22–384:21 (laying the foundation for the defendant's sworn statement to be admitted into evidence).

Defense counsel called Evelyn Price as a witness. *See id*. at 419:7–8. Price identified herself as the food service administrator at STDC. *See id*. at 419:20–22. Price testified that her position is the highest ranking position in the kitchen and she was Aguilar's direct supervisor. *See id*. at 420:3–17, 436:17–25 (explaining that she is the highest ranking person in the kitchen and the defendant was in the position as her clerk at the time the incident occurred). She testified that the defendant was her secretary, who mostly performed clerical tasks, although she would direct him to work in the kitchen when needed. *See id*. at 433:1–9 (listing the clerical tasks that the defendant would normally perform: make copies, file, data entry, compile audit binders); *id*. at 433:10–22, 434:24–435:6 (listing other tasks that she would ask the defendant to do: check on the kitchen, prepare religious and medical meals, conduct inventory, move boxes in the freezer). She testified that the defendant's primary job duties did not include supervision of other employees or detainees. *Id*. Nevertheless, she also testified that when the defendant is filling in in the kitchen, he has the same duties and authority as kitchen supervisors. *See id*. at 442:18–443:12 (stating that the detainees must follow the defendant's instructions).

Price testified that when Aguilar worked in the kitchen, he did not have the authority to punish a detainee or the authority to require that a detainee leave the kitchen. *See id*. at 434:13–23, 438:15–439:5 (requiring that proper documentation needed to be filled out and submitted to the chief of security). Nevertheless, she testified that "[c]ustody and security within the

17

department is the responsibility of food service personnel, even when security personnel are present." 437:19–22. *See id*. at 437:23–1 (admitting that she and the defendant's positions are both considered food personnel). Moreover, Price testified that when any food service personnel isolates a detainee, that food service personnel has custody over and is supervising that detainee. *See id*. at 438:2–14 (describing "isolate" as taking a detainee to the freezer or dry warehouse); *see also id*. at 439:6–11 (stating that the detainee handbook requires detainees to follow the instructions of all prison staff personnel); *id*. at 439:12–14 (admitting that the defendant is prison staff personnel).

Juan Aguilar also testified on his behalf. He testified that as the food service clerk, his main duties were working directly for Ms. Price and included making coffee, filing paperwork, making copies, answering phones, and filling in the kitchen when she instructed him to. *See id*. 467:21–468:22 ("She knew what her staff was and what was going to be required that day, so if she needed me out there, she would put me out there."). On direct-examination, Aguilar further testified that when he was working in the kitchen as clerk, he would need to ask the kitchen supervisors to unlock the employee bathroom and to escort the detainees. *See id*. 468:23–469:13 (stating that he did not have the authority to escort the detainees). He provided conflicting testimony about whether or not he had the authority to give detainees instructions. *See id*. 472:20–25 (conceding that he supposed he had the authority to instruct detainees but he never did so); 485:4–16 (admitting that he had the authority to tell the inmates what to do); *see also id*. at 485:12–13 (stating that through Ms. Price's authority, he was able to tell the detainees what to do). On the day of the incident, Aguilar testified that he asked Mr. Ghazi for a detainee to help

in the freezer and gave the detainee the orange jacket to wear in the freezer. *See id*. 473:9–10, 485:22–25.

During cross-examination, the defendant testified that he knew it was a crime to engage in a sexual act with the detainee. *See id*. 481:15–17; *see also id*. 481:18–24 (clarifying that he was not permitted to perform a sex act). He further acknowledged that, although he had not met Lanza earlier[9], he was aware that Lanza was an immigration detainee. *Id*. 483:9–25.

Calderon Flores's additions to the custodial, supervisory, and disciplinary authority element would have been limited. Calderon Flores called every employee he contacted at STDC "oficial," including Aguilar. Docket no. 86-1 at 2. Calderon Flores's affidavit states Aguilar "never gave [him] orders, instructions or supervision." *Id*. This statement does not provide a basis for Calderon Flores's knowledge that Aguilar could not give him orders or supervise detainees, or be read to say Aguilar did not have that authority. The affidavit does say that Andino Lanza followed Aguilar into the freezer and Calderon Flores "believes" Mr. Ghazi told Andino Lanza "to go help in the freezer."[10] Even assuming Ghazi directed Andino Lanza in this way, that would not have stopped Aguilar from giving the victim an orange jacket, telling him to "follow," or telling him which boxes to move and where. All of those are acts of supervision Aguilar himself admitted to and Calderon Flores does not contradict.

Aguilar argues that Calderon Flores's testimony would have been particularly poignant to the jury because he would have been the only non-interested party testifying at trial. He argues

---

[9] This fact also provides some circumstantial evidence to support the jury's finding that Aguilar possessed supervisory control over Lanza.

[10] The affidavit also states Calderon Flores believes "Andino may have made up the reported incident" because Flores "heard about another reported incident at [STDC] between a female officer and a male detainee. The officer was fired and the detainee was given papers." Calderon Flores believes the victim "knew about this incident and wanted papers to stay as well." Ignoring the admissibility of these statements under the Federal Rules of Evidence, they do not go to the issue of custodial, supervisory, or disciplinary authority and, as the Court found above, are not relevant to this motion. Indeed, Calderon Flores' beliefs are directly contradicted by the fact that Aguilar admits to performing a sex act upon Lanza.

that all the STDC employees were tainted because of their employment at the facility, and Andino Lanza was also because of his desire to cooperate with the Government so that he may be allowed to stay in the United States. Despite these arguments, Calderon Flores provides no basis for his personal knowledge that Aguilar lacked any custodial, supervisory, and disciplinary authority over Lanza. In addition, as stated above, Calderon Flores' subjective belief that no sex act occurred is refuted even by the Defendant.

From the evidence presented at trial above, Calderon Flores's subjective belief about the custodial, supervisory, or disciplinary control was immaterial because it was cumulative and would not have reasonably impacted the jury's ultimate conclusion on that element. *Valenzuela–Bernal*, 458 U.S. at 874.

### III.   Conclusion

For the reasons stated above, Defendant's Motion for New Trial (docket no. 86) is DENIED.

SIGNED this 25th day of November, 2014.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE